# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KEVIN B. TABY, | : | CIVIL ACTION |
| Plaintiff | : | |
| | : | |
| v. | : | NO. 08-2746 |
| | : | |
| FIREMAN'S FUND | : | |
| INSURANCE COMPANY | : | |
| Defendant | : | |

## M E M O R A N D U M

**STENGEL, J.**                                             **September 30, 2009**

Kevin B. Taby is suing the Fireman's Fund Insurance Company, his former employer, for employment discrimination based on age pursuant to the Age Discrimination in Employment Act,[1] 29 U.S.C. §§ 621, *et seq.*, and the Pennsylvania Human Relations Act,[2] 43 P.S. §§ 951, *et seq.*  In his complaint, removed here from the Court of Common Pleas of Northampton County, Mr. Taby brings claims for disparate

---

[1]  The ADEA provides, in relevant part, that "[i]t shall be unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1); see also Gross v. FBL Financial Services, Inc., 129 S.Ct. 2343, 2350 (2009).

[2]  The PHRA provides:  It shall be an unlawful discriminatory practice, . . . (a) For any employer because of the race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap or disability or the use of a guide or support animal because of the blindness, deafness or physical handicap of any individual or independent contractor, to refuse to hire or employ or contract with, or to bar or to discharge from employment such individual or independent contractor, or to otherwise discriminate against such individual or independent contractor with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract, if the individual or independent contractor is the best able and most competent to perform the services required.  43 Pa. Cons. Stat. Ann. § 955(a).

treatment, disparate impact, and unlawful retaliation.  The defendant filed a motion for summary judgment, and the plaintiff responded.  For the following reasons, I will grant the motion in its entirety.

## I.  BACKGROUND[3]

Kevin Taby, born in 1956, began his employment at the Fireman's Fund Insurance Company in February 1984.  See Compl. ¶ 3.  The complaint alleges that during his employment, Mr. Taby received twenty-one satisfactory performance evaluations.  Id. ¶ 7. At the time of his termination, he held the position of phone team manager.   Id. ¶ 6. Sally Custenborder, Mr. Taby's direct supervisor, asked Mr. Taby to give a written performance warning to Adjner Gedeus, an African American woman over the age of forty whom Mr. Taby alleges was disabled.  Id. ¶¶ 9-11.  Mr. Taby objected to the request because there were three other employees who had received verbal warnings for the same performance issues.  Id. ¶¶ 12-14.  Those employees were not in a protected class.  Mr. Taby sought guidance from the defendant's human relations department because he felt uncomfortable giving a written warning to an employee in a protected class.  Id. ¶ 15. The human relations department allegedly advised Mr. Taby to issue a verbal warning to Miss Gedeus, rather than the written warning.  Id. ¶ 16.  The complaint alleges that when Miss Custenborder realized that Taby had issued a verbal warning against her

---

[3]  The facts in this section are taken directly from the complaint as noted.  Where necessary, the facts will be presented and discussed in more depth below.

instructions, she became furious with him and in turn gave Mr. Taby a verbal warning in retaliation.  Id. ¶ 17.

Shortly thereafter, Geralyn Barbato replaced Miss Custenborder.  Id. ¶ 18.  After six weeks on the job, Miss Barbato decided to terminate Mr. Taby's employment citing performance problems.  Id. ¶ 19.  The complaint alleges that the defendant replaced Mr. Taby with Lynn Confalone, a younger female.  Id. ¶ 23.

## II.  STANDARD FOR SUMMARY JUDGMENT

Summary judgment shall be awarded "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED.R.CIV.P. 56(c).  A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" only if it might affect the outcome of the suit under governing law. Id.

A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply

by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325. After the moving party has met its initial burden, "the adverse party's response, by affidavits or otherwise as provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." FED.R.CIV.P. 56(e). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. All inferences must be drawn and all doubts resolved in favor of the nonmoving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); Gordon v.Youmans, 358 F.2d 261, 262 (2d Cir. 1965); Gans v. Mundy, 762 F.2d 338, 341 (3d Cir. 1985); Liberty Lobby, 477 U.S. at 255. The court must decide not whether the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. Liberty Lobby, 477 U.S. at 252. If the non-moving party has met the extraordinarily low burden of evidence and offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent. Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## III. DISCUSSION

### A. **Disparate Treatment**

In Counts I and IV of the complaint, Mr. Taby asserts claims for age discrimination, i.e., disparate treatment, under the ADEA and the PHRA, respectively.[4] He alleges that during his employment, his performance equaled or exceeded the standards established by the defendant, as evidenced by the satisfactory performance appraisals he received over the years.  See Compl. ¶ 34.  Thus, Mr. Taby alleges, given his satisfactory work performance and the lack of non-pretextual grounds for his termination, the defendant's motive must have been illegal and discriminatory.  Id. ¶ 35. The defendant argues that it is entitled to judgment as a matter of law on these counts because there is no evidence of a discriminatory motive, and because it had a legitimate nondiscriminatory business reason for terminating Mr. Taby's employment.  I agree.

To establish a disparate treatment claim under the plain language of the ADEA, a plaintiff must prove that age was the "but-for" cause of the defendant's adverse decision. Gross, 129 S.Ct. at 2350 (a plaintiff must prove by a preponderance of the evidence,

---

[4]  The same legal standard applies to both the ADEA and the PHRA, and therefore it is proper to address them collectively.  Milby v. Greater Philadelphia Health Action, et al., 2009 U.S. App. LEXIS 16420, *3, n.3 (3d Cir. July 27, 2009) (citing Kautz v. Met-Pro Corp., 412 F.3d 463, 466 n.1 (3d Cir. 2005)).  While Pennsylvania courts are not bound in their interpretations of Pennsylvania law by federal interpretations of parallel provisions in Title VII, the ADA, or the ADEA, its courts nevertheless generally interpret the PHRA in accord with its federal counterparts.  Gomez v. Allegheny Health Servs., Inc., 71 F.3d 1079, 1083-84 (3d Cir. 1995). Accordingly, I shall specifically address only the ADEA claims which analysis applies equally to the PHRA claim.  Kelly v. Drexel University, 94 F.3d 102, 105 (3d Cir. 1996).

which may be direct or circumstantial, that age was the "but-for" cause of the challenged

employer decision).  The burden of persuasion does not shift to the employer to show that

it would have taken the action regardless of age, even when a plaintiff has produced some

evidence that age was one motivating factor in that decision.  Id. at 2352.  An employer

discriminates because of age only if the employee's age actually played a role in the

employer's decisionmaking process and had a determinative influence on the outcome.

Id. at 2355 (citing Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993)).  An employer

defending an ADEA claim does not need to show why its conduct was not discriminatory

until the plaintiff first presents evidence that he suffered at least some employment

discrimination relating solely to his age.  Id. at 2348.

The Supreme Court has approved analyzing an ADEA claim under the McDonnell

Douglas framework when the parties agree, as here, that applying the framework is

proper.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000).  Under the

McDonnell Douglas framework,

> an employee must first establish a *prima facie* case of
> discrimination, after which the burden shifts to the employer
> to articulate a legitimate nondiscriminatory reason for its
> adverse employment decision.  If the employer articulates one
> or more such reasons, the aggrieved employee must then
> proffer evidence that is sufficient to allow a reasonable finder
> of fact to find by a preponderance of the evidence that the
> employer's proffered reasons are false or pretextual.

Milby v. Greater Philadelphia Health Action, et al., 2009 U.S. App. LEXIS 16420 at *3

(quoting Fasold v. Justice, 409 F.3d 178, 184 (3d Cir. 2005)).

To establish a *prima facie* case of age discrimination under the ADEA, a plaintiff must demonstrate that he (1) was over the age of 40; (2) was qualified for the position; (3) suffered an adverse employment decision; and (4) ultimately was replaced by a person sufficiently younger to permit an inference of age discrimination.  Barbee v. SEPTA, et al., 323 Fed. Appx. 159, 161 (2009) (quoting Monaco v. Am. Gen. Assur. Co., 359 F.3d 296, 300-301 (3d Cir. 2004)).

It is undisputed that Mr. Taby satisfies the first element of the *prima facie* case in that he was born in 1956 and was 49 years old when he was terminated.  The remaining two elements, however, need further evaluation.

Mr. Taby alleges that he was replaced by Lynn Confalone, a younger employee.  However, at his deposition, Mr. Taby testified that the defendant had hired Miss Confalone before he was terminated, that he did not know what her title was, that he had no personal knowledge regarding her responsibilities, and that he had no personal knowledge whether she was over forty years of age when she was hired.  See Taby Dep. at 152-153.  Kim Tredo, the defendant's senior human resources consultant, indicated that Miss Confalone was hired by the defendant in August 2005 as a Project Manager, that she was forty-two years old when she was hired, and that she was not hired to replace Mr. Taby.  See Tredo Aff. ¶¶ 18, 19, 20.  While it seems unlikely that Miss Confalone was hired to replace Mr. Taby, a definite ruling on this element of the *prima facie* case is not necessary.

7

Whether Mr. Taby was qualified for the position is also not definitive.  As the evidence below establishes, Mr. Taby had been struggling since at least 2003 to perform most of the managerial tasks required for his job.

Mr. Taby held the position of customer service manager from 1993 to 2005, when his position was changed to telephone team manager.  <u>See</u> Taby Dep. at 16.  The duties of both positions were essentially the same.  <u>Id.</u> at 28.  Those responsibilities included ensuring that his team satisfied the defendant's performance standards, i.e., compliance with the defendant's minimum "response time" and "processing time."  <u>See</u> Barbato Aff. at ¶ 4; Custenborder Aff. at ¶ 8.  Mr. Taby was also responsible for providing the team with the tools and training necessary to accomplish a high level of customer service; and utilizing the telephone production reports to evaluate the performance of the team and provide them with feedback on how to improve.  <u>Id.</u>

E.J. Powers, Mr. Taby's supervisor in 2003, prepared Mr. Taby's 2003 performance evaluation, and noted that Mr. Taby's production numbers were below average and that he was experiencing serious communication issues with his team.  <u>See</u> <u>See</u> Def. Ex. D.  Mr. Powers also noted that it was incumbent upon Mr. Taby to keep up with the changes in the expectations for his position.  <u>Id.</u>  Mr. Powers emailed Mr. Taby a recap of the discussion of the evaluation he had with Mr. Taby where he reiterated that it was important for Mr. Taby to improve the level and quality of the communication he had with his staff and other managers, and to eliminate the passive-aggressive behavior that

8

was isolating him from his peers.  <u>See</u> Def. Ex. E.  Mr. Powers made similar observations in Mr. Taby's 2004 performance evaluation.  <u>See</u> Def. Ex. F.

In April 2005, when Miss Custenborder replaced Mr. Powers on an interim basis, she noticed immediately that Mr. Taby's phone team was not meeting performance expectations.  <u>See</u> Custenborder Aff. ¶¶ 3, 9.  For example, although the defendant's established metric for answering a call was less than 16 seconds, Mr. Taby's team's time ranged from 25 seconds to 40 seconds in May 2005.  <u>Id.</u>  Miss Custenborder was more disturbed by the fact that when she asked Mr. Taby about his team's poor performance, he was unable to provide any explanation or to identify a plan of action to address the situation.  <u>Id.</u>  Miss Custenborder also noted that she had received complaints from the agents of the defendant about the poor quality of services provided by Mr. Taby's phone team, and Mr. Taby's failure to respond to their complaints.  <u>Id.</u> ¶ 14.  This prompted the agents to contact Miss Custenborder directly for assistance.  <u>Id.</u>  While Mr. Taby acknowledged to her that his team members had gaps in their knowledge and customer service skills, he failed to monitor regularly their calls to provide the team with feedback, and took no significant action to secure additional training for his team.  <u>Id.</u> ¶ 11.  In fact, despite Miss Custenborder's coaching and counseling, Mr. Taby was unwilling or unable to improve his team's performance.  <u>Id.</u> ¶ 16.  According to Miss Custenborder, Mr. Taby's work ethic was "completely lacking."  He often arrived late for work and left early.  <u>Id.</u> ¶ 13.

At one meeting with Miss Custenborder in April 2005, Mr. Taby discussed the unacceptable performance of Miss Gedeus.  Id. ¶ 19.  Miss Custenborder told Mr. Taby that it was his responsibility to ensure that Miss Gedeus was able to contribute to the team.  Mr. Taby responded that he would give Miss Gedeus a verbal warning and advise her that the continued failure to meet the standards could result in the termination of her employment.  Id. ¶ 20.  A few weeks later, Miss Custenborder asked about Miss Gedeus' performance.  Mr. Taby responded that he had issued Miss Gedeus a verbal warning and had had several follow-up conversations with her to provide her with updates on her performance.  Id. ¶ 21.  When reviewing the statistics for the month of May 2005, Miss Custenborder realized that Miss Gedeus had still failed to meet the expected standards.  Assuming he had already given her a verbal warning as he indicated, Miss Custenborder informed Mr. Taby that it was time to issue a written warning to Miss Gedeus.  Id. ¶¶ 22, 23.  On June 3, 2005, Mr. Taby notified Miss Custenborder that he had met with Miss Gedeus to discuss her performance deficiencies, and that he had issued her a written warning.  Id. ¶ 25.  Two weeks later, Miss Custenborder asked for a copy of the written warning.  Mr. Taby finally admitted that he had not given the warning to Miss Gedeus as he had represented, but had given her a verbal warning instead.  Id. ¶ 26.  Miss Custenborder said that she was outraged that Mr. Taby would lie to her.  She informed him that she would not tolerate any other such incidents.  Id.  Under renewed orders from Miss Custenborder, Mr. Taby prepared and presented a written warning to Miss Gedeus

on June 27, 2005.  Id. ¶¶ 27, 28; Taby Dep. at 104, 105.  He agreed with the decision to give her the written warning, and did not object when told to do so.  Id. at 105.

Miss Gedeus asked to speak with Miss Custenborder about the written warning. She told Miss Custenborder that she felt the measurements of her production and quality were not fair because she was not doing the same work as the rest of the team but was being measured with the same standard.  In fact, she said that she had never received the necessary training to perform her job.  See Custenborder Aff. ¶ 31.  Mr. Taby had repeatedly represented to Miss Custenborder that he had provided the tools and resources necessary to help Miss Gedeus succeed.  Id. ¶ 32.  Because Mr. Taby had recently admitted lying to her, Miss Custenborder decided to investigate the training that Miss Gedeus had received, and the method used to evaluate her performance.  Id. ¶ 33.  This investigation showed that Mr. Taby had not provided Miss Gedeus with adequate training to enable her to perform the tasks of a telephone customer service associate but was holding her to the same performance standards as other fully-trained customer service associates.  Id. ¶ 34.  Miss Custenborder then instructed Mr. Taby to rescind the written warning and to develop and implement a plan to train Miss Gedeus properly to ensure her success in the job.  Id. ¶ 35.

By the end of June 2005, Miss Custenborder had identified serious deficiencies in Mr. Taby's performance, discussed them with him on several occasions, yet saw no improvement in the results of his team or his own responsiveness.  Id. ¶ 36.  Thus, on July

11

1, 2005, she placed him on written warning for unacceptable work performance, identifying the deficiencies, and stressing that any future occurrences of lying would result in his immediate termination.  Id. ¶¶ 37, 38, 39.  It was also made clear to Mr. Taby in the warning that failure to correct the deficiencies or to sustain satisfactory improvement during the sixty day warning period might result in further action, up to and including termination of his employment.  Id. ¶ 40.

Later that month, after Miss Barbato replaced Miss Custenborder, they both met with Mr. Taby to follow up on his written warning, and to advise him that he was still failing to perform his responsibilities at an acceptable level.  See Barbato Aff. ¶ 10; Custenborder Aff. ¶ 41.  Afterward, Miss Custenborder summarized the meeting in a memo:

> We had a discussion around what I see as Kevin's inability to manage the results of the phone team as well as his biggest issue around managing his staff.  We talked about him not addressing employee issues in a professional manner, this showing of favoritism to certain staff members, his sharing of confidential information with staff members.  It was made clear to him that I feel he is not meeting expectations in these areas and immediate improvement is needed.

Id.; see also Custenborder Aff. Ex. E.

Miss Barbato continued to monitor Mr. Taby's management of his team and met with him regularly throughout the remainder of the warning period to discuss her observations.  See Barbato Aff. ¶¶ 11, 14, 15; see also Taby Dep. at 139.  Miss Barbato noted that Mr. Taby's team was among one of the worst performing groups in the

company.  See Barbato Aff. ¶ 5.  Mr. Taby was unable to provide Miss Barbato with

explanations for his group's deficient performance.  Id. ¶ 6.  Over the sixty-day period,

Mr. Taby failed to make substantial improvements in the areas identified in the

performance warning.  Id. ¶¶ 12-18; Taby Dep. at 139-140.  For example, Mr. Taby's

inadequate performance included failure to monitor the phone team's calls, failure to

analyze the phone reports to develop an action plan to improve the phone team's

production results, failure to properly manage the work assignments of the phone team,

failure to provide the phone team with necessary training, and failure to follow the

instructions of his supervisor.  See Barbato Aff. ¶¶ 15, 19, 20.  In August 2005, Miss

Barbato listened to tape recordings of the calls handled by every member of Mr. Taby's

team, and discovered significant service problems including a lack of knowledge on the

part of the customer service associates.  It became obvious to Miss Barbato that Mr. Taby

had not been properly utilizing the phone monitoring process and had failed to take the

appropriate steps necessary to improve the quality of service provided by his team despite

several months of counseling.  Id. ¶¶ 12, 13.  Miss Barbato met with Mr. Taby on August

15, 2005 and reviewed the problems she heard in his team's telephone calls.  Mr. Taby

responded that he was aware of the issues and would work on them.  Id. ¶ 14; see also

Barbato Aff. Ex B.  Two weeks later, Miss Barbato met again with Mr. Taby to discuss

the continuing deficiencies in his performance.  During that meeting, it became evident

that Mr. Taby had failed to perform any of the tasks Miss Barbato had assigned him at

their last meeting.  Specifically, he failed to: (1) provide an explanation for the unusually high volume of outbound calls for the phone team; (2) take any action to identify and address the training needs of his team; or (3) have the team members themselves listen to their taped telephone calls.  See Barbato Aff. ¶ 15.  At the end of the meeting, Miss Barbato reminded Mr. Taby that there remained several areas in which he required significant improvement, and that a determination would be made at the end of the warning period as to whether he was performing at an acceptable level.  Id. ¶ 17.

Miss Barbato met with Mr. Taby for the last time on September 9, 2005, and explained to him that there were still many weaknesses included in his warning that needed to be resolved like training, quality, phone skill, and work flow management.  Id. ¶ 18.  Although the warning document indicated that phone monitoring reports were to be submitted on a weekly basis, Mr. Taby only provided them on one occasion during the period.  He also did not proactively address performance issues with his employees or accomplish any significant training of them.  Id. ¶ 19.  On one occasion, Mr. Taby scheduled four of his thirteen employees to attend a training session while several others were at lunch.  This schedule resulted in the following negative impact on the team's results: during that period, the team's average response time was four minutes and nineteen seconds with twenty-eight calls being simply abandoned.  Id. ¶ 20; see also Barbato Aff. Ex. D.

Miss Barbato prepared a memorandum to her manager recommending Mr. Taby's

14

termination based on his overall work performance during the sixty-day warning period.
See Barbato Aff. ¶ 21.  The manager agreed and Mr. Taby was terminated on September
14, 2005, for his inability to meet his performance goals.  Id. ¶¶ 22, 24.

Kim Tredo was the senior human resources consultant for the defendant during the
relevant period.  In her sworn affidavit, Miss Tredo indicated that Mr. Taby told her that
despite training Miss Gedeus three times, she was unable to perform the tasks for her
position at an acceptable level.  Miss Tredo subsequently helped Mr. Taby prepare a
written warning document for Miss Gedeus.  See Tredo Aff. ¶ 4.  During their meetings,
Mr. Taby never mentioned that Miss Custenborder told him to issue Miss Gedeus a
written warning before first giving her a verbal warning.  Id. ¶ 5.  However, the
defendant's policy did not prohibit giving an employee a written warning without first
giving a verbal warning, depending on the circumstances.  Id. ¶ 6.  Miss Tredo
understood, however, that Miss Gedeus had received a verbal warning before she helped
Mr. Taby prepare the written warning.  Id. ¶ 7.

Miss Tredo was informed about Mr. Taby's poor performance by both Miss
Custenborder and Miss Barbato.  These performance issues were similar to ones which
had already been documented by Mr. Powers.  Id. ¶ 9.  She was aware that Miss Barbato
had met regularly with Mr. Taby to provide him with guidance and feedback.  Id. ¶ 11.
Miss Tredo was present at the meeting when Miss Barbato informed Mr. Taby of his
termination.

Given this overwhelming and uncontroverted evidence, I find that Mr. Taby was not qualified for the position of phone team manager which he had held with the employer the time of his termination.  Accordingly, I find that Mr. Taby has not satisfied the elements of a *prima facie* case of discrimination.

Nevertheless, assuming that Mr. Taby could have satisfied those elements, the burden would shift to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment decision.  If the employer articulates one or more such reasons, the aggrieved employee must then proffer evidence that is sufficient to allow a reasonable finder of fact to find by a preponderance of the evidence that the employer's proffered reasons are false or pretextual.  Fasold, 409 F.3d at 184.

Here, the defendant has articulated Mr. Taby's poor performance as its legitimate nondiscriminatory reason for Mr. Taby's termination.  The record is replete with evidence of that poor performance as far back as 2003.  Despite receiving coaching and counseling from his managers for the eighteen month period before his termination, Mr. Taby was not able to correct the deficiencies in his performance.  He consistently failed to follow the instructions of his managers, and was unresponsive to the numerous complaints against his unit by the defendant's agents in the field and his own managers.  The Third Circuit has repeatedly recognized that poor job performance is a legitimate reason for termination.  See Scully v. Allegheny Ludlum Corp., 257 Fed. Appx. 535, 537 (3d Cir. 2007); Simpson v. Kay Jewelers, 142 F.3d 639, 645 (3d Cir. 1998).

16

To survive this summary judgment motion under these circumstances, Mr. Taby must either (1) discredit the proffered reasons for the adverse employment action, either circumstantially or directly, or (2) adduce evidence, whether circumstantial or direct, that age discrimination was more likely than not the "but for" cause of his termination.  <u>Gross</u>, 129 S.Ct. at 2350.

Mr. Taby has attempted to show that his poor performance was a pretext for discrimination by contending only that "there are enough inconsistencies in defendant's purported reasons for terminating Taby for the matter to be determined by a jury."  This contention, without more, is insufficient.  To avoid summary judgment, a plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder to infer that those reasons were either a *post hoc* fabrication or otherwise did not actually motivate the employment action.  <u>Kautz v. Met-Pro Corp.</u>, 412 F.3d 467 (3d Cir. 2005).  Mr. Taby points to no weakness, implausibility, inconsistency, or contradiction in the defendant's proffered legitimate reason for his termination.  He further has provided no evidence to suggest that the legitimate reasons for his termination were fabricated; contacted no one at the human resources department to object to his final warning; and took no action to refute the description of his performance deficiencies as documented by his managers.  There is no evidence of pretext.

I find that Mr. Taby has failed to demonstrate that a genuine issue of material fact exists as to whether his age was the "but-for" cause of the defendant's decision to

terminate his employment.  Accordingly, I shall grant the defendant's motion for summary judgment in Counts I and IV.

## B.  Disparate Impact

In Count II, in the alternative, Mr. Taby alleges that even if he is unable to prove that the defendant had a motivation to discriminate against him, its actions nevertheless had a disparate impact on him due to his age.  See Compl. ¶ 40.  He further alleges that younger employees have not been adversely impacted in the same manner that he has been adversely impacted.  Id. ¶ 41.  The defendant argues that this claim is deficient as a matter of law because Mr. Taby has failed to identify the "actions" of which he complains or how those unnamed actions had a disparate impact on him because of his age.  I agree.

Disparate impact cases "should proceed in two steps: (1) the plaintiff must prove that the challenged policy discriminates against members of a protected class, and then (2) the defendant can overcome the showing of disparate impact by proving a 'manifest relationship' between the policy and job performance."  El v. SEPTA, 479 F.3d 232, 239 (3d Cir. 2007).  It "is not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact.  Rather, the employee is responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities."  Smith v. City of Jackson, 544 U.S. 228, 241 (2005).

Here, in his response to the motion, Mr. Taby provides illustrations of workplace

policies which may appear facially neutral but nevertheless have an unfair impact on older employees. One example he provided is a job test that focuses on computer literacy for a position that does not require the use of a computer. Such a test might have an adverse effect on older applicants. Notwithstanding this apparent understanding, Mr. Taby has not identified any evidence of a specific employment practice or policy responsible for a disparate impact he alleges, nor any statistical disparity that exists at the defendant. He offers no evidence to buttress a claim of an unfair impact on its older employees. Because Mr. Taby fails to connect these allegations to any specific employment practice or statistical disparity, as required, I will also grant summary judgment in the defendant's favor in Count II. See Baraka v. McGreevey, 481 F.3d 187, 195 (3d Cir. 2007).

### C. Retaliation

In Count III of his complaint, Mr. Taby alleges that his termination was also based on his refusal to issue a written warning to a protected employee, i.e., an over-forty year old African American woman whom he alleges is disabled. Mr. Taby does not cite a specific statute upon which this claim is based. Because the retaliation provisions in the relevant statutes have been considered coextensive, this deficiency in the complaint is not fatal.

The anti-retaliation provision of Title VII makes it an unlawful employment practice for an employer to discriminate against any of its employees or applicants for

employment because he has opposed any practice made an unlawful employment practice by Title VII's substantive provisions, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing thereunder. 42 U.S.C. § 2000e-3(a). The ADEA contains an anti-retaliation provision that is not materially different from that contained in Title VII, thereby providing protection for those employees who oppose proscribed age discrimination practices. 29 U.S.C. § 623(d). In addition, the PHRA has an anti-retaliation provision prohibiting employers from retaliating against employees who oppose discrimination based on the criteria enumerated therein, including discrimination based on race and age. 43 P.S. § 955(d).

To establish a *prima facie* case of retaliation under the applicable statutory provisions, Mr. Taby must demonstrate: (1) that he engaged in conduct protected under the relevant provision; (2) that the defendant took a materially adverse action against him; and (3) that there was a causal relationship between his protected conduct and the defendant's materially adverse action. Kachmar v. Sungard Data Systems, Inc., 109 F.3d 173, 177 (3d Cir. 1997).

It is undisputed that the second element of the *prima facie* case of retaliation has been satisfied because Mr. Taby's employment with the defendant was terminated. The remaining two elements, however, are not as clearly established.

Initially, it is important to note that the category of conduct protected under these statutes is not limited to the filing of formal complaints or the initiation of administrative

20

exhaustion.  Informal complaints constitute "protected activity" under these statutes.  <u>See</u> <u>Lin v. Rohm & Haas Co.</u>, 293 F.Supp.2d 505, 512, n. 2 (E.D. Pa. 2003).  The conduct complained of need not be independently actionable under the applicable substantive provision.  <u>Aman v. Cort Furniture Rental Corp.</u>, 85 F.3d 1074, 1085 (3d Cir. 1996).  It is enough for a plaintiff to demonstrate that he acted under a reasonable belief that the conduct of which he complained constituted a violation of the relevant statute.  <u>Jackson v. Birmingham Board of Education</u>, 544 U.S. 167, 187-188 (2005).

Here, Mr. Taby alleges that he objected to Miss Custenborder's request to give an employee a written warning without first giving her a verbal warning, because that employee was in a protected class.  He claims that three other employees not in a protected class had received verbal warnings for the same performance issues.  Mr. Taby alleges that the defendant retaliated against him for his protest by terminating his employment.

I am not persuaded that under these circumstances a reasonable employee would have considered the defendant's conduct discriminatory.  <u>See</u> <u>Zappan v. Pa. Bd of Probation and Parole</u>, 152 Fed. Appx. 211, 218 (3d Cir. 2005) (citing <u>Clark County Sch. Dist. v. Breeden</u>, 532 U.S. 268, 271 (2001)) (the Supreme Court has made clear that simply opposing an employment practice does not rise to the level of a protected activity if no reasonable person could believe that the actions complained of were unlawful).  Miss Custenborder asked Mr. Taby to issue a performance warning to one of his

employees who had been genuinely struggling with her job tasks, after he had discussed the employee's poor performance with Miss Custenborder.  In making that request, Miss Custenborder made no mention of Miss Gedeus's race, gender, or disability.  There could be no reason why Mr. Taby would assume the request for a warning was discriminatory because he was aware of Miss Gedeus's history of poor performance with the company, and had complained about that performance to Miss Custenborder.  He also testified that he believed that Miss Gedeus's performance under his supervision was deficient, and that he had contacted a human resources representative for assistance in issuing Miss Gedeus a performance warning even before Miss Custenborder told him to issue the warning. Mr. Taby also testified that he agreed there were justifiable bases to give Miss Gedeus both a verbal and a written warning.  See Taby Dep. at 156.  Miss Tredo, the human resources representative, indicated that Mr. Taby did not tell her that he felt that Miss Gedeus was being discriminated against.  See Tredo Aff. ¶ 5.

Mr. Taby also testified that three other female employees of the defendant were being counseled for the same performance issues as Miss Gedeus.  See Taby Dep. at 159. He was not responsible for supervising any of these employees and had no direct personal knowledge of their work performance.  Id. at 159-161.  Nevertheless, he included them in his complaint as examples of how Miss Gedeus was being treated differently.  Miss Barbato indicated that there is no truth to this allegation because one of the employees, i.e., Barbara Schwartz, received a written warning, and another employee, i.e., Ann

Spanos, was terminated from the defendant.  All of these employees had different

performance deficiencies.  See Barbato Aff. ¶ 30.

Based on this record, I find that Mr. Taby could not have reasonably believed that

Miss Custenborder's instruction to him was discriminatorily motivated.  Accordingly, I

am constrained to find that Mr. Taby did not engage in protected activity.

Even assuming that Mr. Taby had engaged in such activity, his claim for retaliation

would still fail.  There is no evidence that his termination was casually related to his

concerns about the alleged discriminatory treatment of Miss Gedeus.  Mr. Taby argues

that the fact that he was terminated shortly after his alleged protected activity is evidence

of a causal relationship between the activity and the adverse decision of the defendant.

Temporal proximity between protected activity and an alleged retaliatory action can

satisfy the element of causation where the timing of the action is "unusually suggestive"

of a retaliatory motive.  Shaner v. Synthes (USA), 204 F.3d 494, 505 (3d Cir. 2000).  The

record shows that Mr. Taby first spoke with Miss Custenborder about Miss Gedeus in

April 2005.  He was terminated on September 14, 2005, over four months later, after

several weeks of counseling and coaching by his managers to assist him in improving his

performance.  Courts in this district have found that four months is a sufficient passage of

time to defeat a claim that the two events are causally related.  Nixon v. Runyon, 856

F.Supp. 977, 988 (E.D. Pa. 1994) (four months); Pritchett v. Imperial Metal and Chem.

Co., 1997 U.S. Dist. LEXIS 13841 at *12 (E.D. Pa. Sept. 8, 1997) (two months); Washco

23

v. Federal Express Corp., 402 F.Supp.2d 547, 559-560 (E.D. Pa. 2005) (five months).

Mr. Taby has offered nothing in addition to the timing of events to show causation.  The

proximity of events in this case is not sufficient alone to show causation.

Nevertheless, like claims of discrimination, retaliation claims are analyzed in

accordance with the McDonnell Douglas framework.  Marra v. Philadelphia Housing

Authority, 497 F.3d 286, 300 (3d Cir. 2007).  I have already determined, within the

context of Mr. Taby's claims of discrimination, that the record does not contain evidence

which sufficiently casts doubt on the defendant's reason for terminating Mr. Taby's

employment to enable a reasonable jury to conclude that he was the victim of unlawful

discrimination.  This reasoning applies with equal force to his retaliation claims.

Because Mr. Taby can neither discount the defendant's articulated reasons for his

termination nor provide affirmative evidence that the defendant was motivated by a

retaliatory animus, no reasonable jury could conclude that he was discharged in retaliation

for complaining about discrimination.  Accordingly, I will grant the defendant's motion

for summary judgment in Count III.

An appropriate Order follows.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KEVIN B. TABY,** | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **NO. 08-2746** |
| | : | |
| **FIREMAN'S FUND** | : | |
| **INSURANCE COMPANY** | : | |
| **Defendant** | : | |

### <u>O R D E R</u>

**AND NOW,** this  30th   day of September, 2009, upon careful consideration of

the defendant's motion for summary judgment (Document #13), the plaintiff's response

thereto (Document #14), and the defendant's reply (Document #15), it is hereby

ORDERED that the motion is GRANTED in its entirety.

The Clerk of Court is directed to mark this case CLOSED for all purposes.


BY THE COURT:


  /s/ Lawrence F. Stengel
LAWRENCE F. STENGEL, J.